**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

| | |
|---|---|
| **GEORGIA POWER COMPANY, OGLETHORPE POWER CORPORATION, MUNICIPAL ELECTRIC AUTHORITY OF GEORGIA, and the CITY OF DALTON, GEORGIA,** Plaintiffs/Counterclaim-Defendants, **v.** **STONE & WEBSTER, INC. , and WESTINGHOUSE ELECTRIC COMPANY LLC,** Defendants/Counterclaim-Plaintiffs. | )<br>)<br>)<br>)<br>)<br>)  **Case No. CV112-167-JLH-WLB**<br>)<br>)<br>)<br>)<br>) |

<u>**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM TO PLAINTIFFS' COMPLAINT (DOC. 1)**</u>

Defendants/Counterclaim-Plaintiffs Stone & Webster, Inc. ("S&W") and Westinghouse Electric Company LLC ("WEC") (collectively the "Contractor"), without waiving their rights to resolve claims and disputes pursuant to the mandatory contractual prerequisites, including the specified procedure of mediation, answer the Complaint (Doc. 1) filed by Plaintiffs/Counterclaim-Defendants Georgia Power Company, Oglethorpe Power Corporation, Municipal Electric Authority of Georgia, and the City of Dalton, Georgia (collectively the "Owners"), assert affirmative defenses and file their Counterclaim against the Owners, and for cause state as follows:

**PRELIMINARY STATEMENT AND RESERVATION OF RIGHTS**

On November 1, 2012, the Contractor filed a Complaint for its affirmative claims in excess of $900 Million against the Owners in the United States District Court for the District of Columbia ("D.C. District Court"). The Contractor is the true plaintiff in this dispute with the Owners. The Owners' Complaint filed in this Court is a preemptive strike in the form of a Declaratory Judgment action against the Contractor designed to nullify the Contractor's

1

Complaint in the D.C. District Court and deprive the Contractor of its rights, as the true plaintiff. The Owners' Complaint was filed in direct contravention of the Parties' contractual disputes procedures, which include the contractual prerequisite and express condition precedent of mediation. Further, the Owners failed to place the Contractor on notice of the Owners' alleged claims and failed to initiate mediation regarding the alleged claims. Nor did the Owners submit their alleged claims to the mediator, or initiate mediation of the Owners' purported claims at a mediation conference, or otherwise. The Owners' claims are therefore premature and due to be dismissed.

## ANSWER
### THE PARTIES

1.      The Contractor admits that Counterclaim-Defendant Georgia Power is a Georgia corporation with its principal place of business in the State of Georgia. Further answering, the Contractor admits that it entered into an engineering, procurement and construction agreement with the Owners (the "EPC Agreement"). The Contractor states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied. Further answering, the Contractor is without sufficient information to form a belief as to the truth and allegations set out in the remaining portions of Paragraph 1 of the Owners' Complaint, and accordingly denies them.

2.      The Contractor admits the following: Counterclaim-Defendant Oglethorpe Power Corporation ("Oglethorpe") is an electric membership corporation formed under the laws of the State of Georgia with its principal place of business in Georgia; Counterclaim-Defendant Municipal Electric Authority of Georgia ("MEAG") is a public body corporate and politic and an instrumentality of the State of Georgia with its principal place of business in Georgia; and

2

Counterclaim-Defendant The City of Dalton ("Dalton") is an incorporated municipality of the State of Georgia. Further answering, the Contractor states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied.

3. The Contractor admits the allegations in Paragraph 3 of the Owners' Complaint.

4. The Contractor admits the allegations in Paragraph 4 of the Owners' Complaint.

5. The Contractor admits the allegations in Paragraph 5 of the Owners' Complaint.

## JURISDICTION & VENUE

6. Paragraph 6 of the Owners' Complaint constitutes a legal conclusion to which no response is required. To the extent a response may be required, the Contractor admits the allegations in Paragraph 6.

7. Paragraph 7 of the Owners' Complaint constitutes a legal conclusion to which no response is required. To the extent a response may be required, the Contractor admits the allegations in Paragraph 7.

8. Paragraph 8 of the Owners' Complaint constitutes a legal conclusion to which no response is required. To the extent a response may be required, the Contractor admits the allegations in Paragraph 8. Further answering, the Contractor admits that its claims against the Owners exceed $75,000.00; however, the Contractor denies that the Owners have any valid claim against the Contractor exceeding $75,000.00.

9. Paragraph 9 of the Owners' Complaint constitutes a legal conclusion to which no response is required. To the extent a response may be required, the Contractor admits the allegations in Paragraph 9, but reserves its right to challenge the propriety of venue in this Court based upon the Contractor's appeal currently pending in the United States Court of Appeals for

3

the District of Columbia Circuit.

## CONDITIONS PRECEDENT

10.     The Contractor denies the allegations in Paragraph 10 of the Owners' Complaint. Further answering, the Owners failed to attempt to resolve their alleged claims against the Contractor pursuant to the contractual and mandatory prerequisite of mediation prior to pursuing litigation.

## FACTUAL ALLEGATIONS

### A.     The EPC Agreement

11.     The Contractor admits it entered into the EPC Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied.  Further answering, the Contractor denies the remaining allegations in Paragraph 11 of the Owners' Complaint.

12.     The Contractor admits that the United States Nuclear Regulatory Commission ("NRC") is an independent agency of the federal government.  Further answering, the NRC's delegated duties and regulations speak for themselves, are the best evidence of their terms and content, and any allegations inconsistent therewith are denied.  Further answering, the Contractor denies the remaining allegations in Paragraph 12 of the Owners' Complaint.

13.     The Contractor admits that the NRC may certify a design for a nuclear reactor by rulemaking pursuant to the procedures set forth at 10 CFR Part 52.   Further answering, the Contractor states that 10 CFR Part 52 speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied.  Further answering, the Contractor denies the remaining allegations in Paragraph 13 of the Owners' Complaint.

14.     The NRC's design certification process speaks for itself, is the best evidence of its

process, and any allegations inconsistent therewith are denied. Further answering, 10 CFR Part 52 speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied.

15.     The NRC certified the AP1000 standard plant design on January 27, 2006, in the Federal Register (71 FR 4464) - and promulgated as Appendix D to 10 CFR Part 52. Further answering, the Federal Register and Appendix D to 10 CFR Part 52 speak for themselves, are the best evidence of their terms and content, and any allegations inconsistent therewith are denied. Further answering, the Contractor admits that the Owners and the NRC required certain changes to that certified design which required Contractor to submit an application to the NRC to amend the AP1000 final design certification rule. The NRC published the AP1000 design certification amendment final rule in the Federal Register on December 30, 2011 (76 FR 8209). Further answering, the Contractor states that the Federal Register speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied. Further answering, the Contractor denies the remaining allegations in Paragraph 15 of the Owners' Complaint.

16.     The Contractor admits it entered into the EPC Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied.

17.     The Contractor admits it entered into the EPC Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied. Further answering, the Contractor denies the remaining allegations in Paragraph 17 of the Owners' Complaint.

18.     The Contractor admits it entered into the EPC Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and

content, and any allegations inconsistent therewith are denied.  Further answering, the Contractor denies the remaining allegations in Paragraph 18 of the Owners' Complaint.

19.     The Contractor admits it entered into the EPC Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied.  Further answering, the Contractor denies the remaining allegations in Paragraph 19 of the Owners' Complaint.

20.     The Contractor admits it entered into the EPC Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied.  Further answering, the Contractor denies the remaining allegations in Paragraph 20 of the Owners' Complaint.

21.     The Contractor admits it entered into the EPC Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied.  Further answering, the Contractor denies the remaining allegations in Paragraph 21 of the Owners' Complaint.

22.     The Contractor admits it entered into the EPC Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied.  Further answering, the Contractor denies the remaining allegations in Paragraph 22 of the Owners' Complaint.

23.     The Contractor admits it entered into the EPC Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied.  Further answering, the Contractor denies the remaining allegations in Paragraph 23 of the Owners' Complaint.

24.     The Contractor admits it entered into the EPC Agreement with the Owners and

US2008 4966429 1

further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied. Further answering, the Contractor denies the remaining allegations in Paragraph 24 of the Owners' Complaint.

25.     The Contractor admits it entered into the EPC Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied. Further answering, the Contractor denies the remaining allegations in Paragraph 25 of the Owners' Complaint.

26.     The Contractor admits it entered into the EPC Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied. Further answering, the Contractor denies the remaining allegations in Paragraph 26 of the Owners' Complaint.

## B.     The Change Disputes

27.     The Contractor admits that it has asserted claims for changes against the Owners entitling the Contractor to amounts in excess of $900,000,000. Further answering, the Contractor incorporates herein by reference Paragraphs 9 through 103 of its Counterclaim as its allegations speak for themselves, are the best evidence of their content, and any allegations inconsistent therewith are denied. Further answering, the Contractor denies the remaining allegations in Paragraph 27 of the Owners' Complaint.

28.     The Contractor admits that it submitted a Change Dispute Notice pursuant to Article 27 of the EPC Agreement on or about June 27, 2012. Further answering, the Contractor states that the Change Dispute Notice speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied. Further answering, the Contractor admits that the parties undertook mediation regarding only the Contractor's claims prior to the

7

Owners' filing of this lawsuit and the Contractor's lawsuit in the D.C. District Court. Further answering, the Contractor denies the remaining allegations in Paragraph 28 of the Owners' Complaint.

29. The Contractor admits that the Owners filed this action with respect to the Contractor's claims for amounts in excess of $900,000,000 upon conclusion of mediation of the Contractor's claims. Further answering, the Contractor denies the remaining allegations in Paragraph 29 of the Owners' Complaint including, but not limited to, the allegation that the Owners have fully complied with the conditions precedent under Article 27 of the EPC Agreement.

**C.      Change Dispute #1 - The Shield Building**

30. The Contractor admits it entered into the EPC Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied. Further answering, the Contractor denies the remaining allegations in Paragraph 30 of the Owners' Complaint.

31. The Contractor admits that it is seeking a Change Order with respect to each of the two Shield Buildings because the Owners and the NRC required changes to the design of the Shield Buildings in DCD Rev. 16. Further answering, the Contractor incorporates herein by reference Paragraphs 19 through 43 and 76 through 82 of its Counterclaim as its allegations speak for themselves, are the best evidence of their content, and any allegations inconsistent therewith are denied. Further answering, the Contractor denies the remaining allegations in Paragraph 31 of the Owners' Complaint.

32. The Contractor admits that the Owners have refused to execute a Change Order with respect to the Contractor's claim on the Shield Building changes. The Contractor denies the

remaining allegations in Paragraph 32 of the Owners' Complaint.

33.     The Contractor admits that the Owners have refused to execute a Change Order with respect to the Contractor's claim on the Shield Building changes.  The Contractor denies the remaining allegations in Paragraph 33 of the Owners' Complaint.

34.     The Contractor admits that the Owners have refused to execute a Change Order with respect to the Contractor's claim on the Shield Building changes.  The Contractor denies the remaining allegations in Paragraph 34 of the Owners' Complaint.

35.     The Contractor admits that the Owners have refused to execute a Change Order with respect to the Contractor's claim on the Shield Building changes.  The Contractor denies the remaining allegations in Paragraph 35 of the Owners' Complaint.

36.     The Contractor admits it entered into the EPC Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied.  Further answering, Paragraph 36 of the Owners' Complaint constitutes a legal conclusion to which no response is required.  To the extent a response may be required, the Contractor denies the allegations in Paragraph 36 of the Owners' Complaint.

37.     The Contractor admits that the Owners dispute the Change Order sought by the Contractor relating to the Shielding Buildings.  The Contractor denies the remaining allegations in Paragraph 37 of the Owners' Complaint.

**D.     <u>Change Dispute #2 - The Structural Modules</u>**

38.     The Contractor admits that it is seeking a Change Order against the Owners because the Owners and the NRC required changes to the structural modules designs for the AP1000 Nuclear Power Plants.  Further answering, the Contractor admits it entered into the EPC

9

Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied. Further answering, the Contractor incorporates herein by reference Paragraphs 44 through 59 and 83 through 89 of its Counterclaim as its allegations speak for themselves, are the best evidence of their content, and any allegations inconsistent therewith are denied. The Contractor denies the remaining allegations in Paragraph 38 of the Owners' Complaint.

39.     The Contractor admits that the Owners have refused to execute a Change Order with respect to the Contractor's claim on the changes made to the structural modules design. The Contractor denies the remaining allegations in Paragraph 39 of the Owners' Complaint.

40.     The Contractor admits that the Owners have refused to execute a Change Order with respect to the Contractor's claim on the changes made to the structural modules design. Further answering, the Contractor admits it entered into the EPC Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied. Further answering, the Contractor incorporates herein by reference Paragraphs 44 through 59 and 83 through 89 of its Counterclaim as its allegations speak for themselves, are the best evidence of their content, and any allegations inconsistent therewith are denied. The Contractor denies the remaining allegations in Paragraph 40 of the Owners' Complaint.

41.     The Contractor denies the allegations in Paragraph 41 of the Owners' Complaint.

42.     The Contractor admits it entered into the EPC Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied. The Contractor denies the remaining allegations in Paragraph 42 of the Owners' Complaint.

US2008 4966429 1

43.     The Contractor admits it entered into the EPC Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied.  The Contractor denies the remaining allegations in Paragraph 43 of the Owners' Complaint.

44.     The Contractor denies the allegations in Paragraph 44 of the Owners' Complaint.

45.     The Contractor admits it entered into the EPC Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied.  Further answering, Paragraph 45 of the Owners' Complaint constitutes a legal conclusion to which no response is required.  To the extent a response may be required, the Contractor denies the allegations in Paragraph 45 of the Owners' Complaint.

46.     The Contractor admits that the Owners dispute the Change Order sought by the Contractor relating to the structural modules' design.  The Contractor denies the remaining allegations in Paragraph 46 of the Owners' Complaint.

**E.      Change Dispute #3 - The LWA/COL Delay**

47.     The Contractor admits that it seeks a Change Order with respect to the Owners' delay in obtaining an LWA by March 30, 2011 and COL by July 1, 2011.  Further answering, the Contractor incorporates herein by reference Paragraphs 60 through 75 and 90 through 96 of its Counterclaim as its allegations speak for themselves, are the best evidence of their content, and any allegations inconsistent therewith are denied.   The Contractor denies the remaining allegations in Paragraph 47 of the Owners' Complaint.

48.     The Contractor admits that the Owners have refused to execute a Change Order with respect to the Contractor's claim regarding to the Owners' delay in obtaining an LWA by

US2008 4966429 1

March 30, 2011 and COL by July 1, 2011. Further answering, the Contractor admits it entered into the EPC Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied. The Contractor denies the remaining allegations in Paragraph 48 of the Owners' Complaint.

49. The Contractor admits it entered into the EPC Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied. The Contractor denies the remaining allegations in Paragraph 49 of the Owners' Complaint.

50. The Contractor admits that the Owners have refused to issue a Change Order with respect to the Contractor's claim regarding the Owners' delay in obtaining an LWA by March 30, 2011 and COL by July 1, 2011. The Contractor denies the remaining allegations in Paragraph 50 of the Owners' Complaint.

51. The Contractor admits that the Owners have refused to issue a Change Order with respect to the Contractor's claim regarding the Owners' delay in obtaining an LWA by March 30, 2011 and COL by July 1, 2011. The Contractor denies the remaining allegations in Paragraph 51 of the Owners' Complaint.

52. The Contractor admits that the Owners dispute the Contractor's June 27, 2012 Change Dispute Notice. The Contractor denies the remaining allegations in Paragraph 52 of the Owners' Complaint.

US2008 4966429 1

**F.** **Defendants' Billings and Owners' Payments to Defendants Under the EPC Agreement for Amounts Allegedly Due**

53.     The Contractor admits that WEC billed the Owners for certain amounts due the Contractor under the express terms of the EPC Agreement for the Change Disputes.  The Contractor further states that the July 10, 2012 billings speak for themselves, are the best evidence of their terms and content, and any allegations inconsistent therewith are denied.

54.     The Contractor admits that the Owners corresponded with the Contractor on July 20, 2012, regarding the Contractor's billings.  Further answering, the Owners' July 20, 2012 correspondence regarding the Contractor's billings speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied.  Further answering, the Contractor admits that WEC issued a billing on August 14, 2012 and S&W issued a billing on August 10, 2012.  Further answering, WEC's August 14, 2012 billing to the Owners and S&W's August 10, 2012 billing to the Owners speak for themselves, are the best evidence of their terms and content, and any allegations inconsistent therewith are denied.  The Contractor denies the remaining allegations in Paragraph 54 of the Owners' Complaint.

55.     The Contractor admits that the Owners corresponded with the Contractor on August 17, 2012, regarding the Contractor's billings.  Further answering, the Owners' August 17, 2012 correspondence regarding billings speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied.  Further answering, the Contractor admits it entered into the EPC Agreement with the Owners and further states that the EPC Agreement speaks for itself, is the best evidence of its terms and content, and any allegations inconsistent therewith are denied.  Further answering, the Contractor denies the remaining allegations in Paragraph 55 of the Owners' Complaint.

13

56. The Contractor admits that it received certain payment from the Owners on or about August 17, 2012. Further answering, those payments speak for themselves, are the best evidence of their terms and content, and any allegations inconsistent therewith are denied.

## DECLARATORY JUDGMENT

57. The Contractor incorporates by reference its responses to Paragraphs 1 through 56 of the Owners' Complaint as if fully set forth herein.

58. In response to the Owners' allegations regarding what have been characterized as the "Change Disputes," the Contractor incorporates herein Paragraphs 9 through 103 of its Counterclaim, as the allegations speak for themselves, are the best evidence of their content, and any allegations inconsistent therewith are denied. The Contractor denies the remaining allegations in Paragraph 58 of the Owners' Complaint.

59. The Contractor denies the allegations in Paragraph 59 of the Owners' Complaint.

60. The Contractor admits that the Owners have refused to issue a Change Order regarding the Contractor's claims that are a part of its Counterclaim. The Contractor admits that the Owners are seeking a judgment declaring that the Contractor is not entitled to Change Orders for each of the claims that are the subject of its Counterclaim. The Contractor denies the remaining allegations in Paragraph 60 of the Owners' Complaint.

## BREACH OF CONTRACT

61. The Contractor incorporates by reference its responses to Paragraphs 1 through 60 of the Owners' Complaint as if fully set forth herein.

62. The Contractor denies the allegations in Paragraph 62 of the Owners' Complaint.

63. The Contractor denies the allegations in Paragraph 63 of the Owners' Complaint.

64. The Contractor denies the allegations in Paragraph 64 of the Owners' Complaint.

US2008 4966429 1

## JURY DEMAND

65.     The Owners expressly and unequivocally waived their right to a trial by jury by including a Waiver of Jury Trial provision in Section 34.2 of the Parties' EPC Agreement that provides as follows:

> 34.2     Waiver of Jury Trial.     EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT.

66.     Any and all allegations of the Owners' Complaint not expressly admitted herein are denied.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Owners' Complaint is barred by the affirmative defenses of estoppel, waiver, release, set-off and unclean hands.

### SECOND AFFIRMATIVE DEFENSE

The Owners' Complaint fails to state a claim upon which relief may be granted.

### THIRD AFFIRMATIVE DEFENSE

The Owners' claims are barred for the reason that all of the Contractor's contractual and legal obligations to Owners have been fulfilled or exceeded.

### FOURTH AFFIRMATIVE DEFENSE

The Owners affirmatively assumed the risk of the position in which they find themselves.

### FIFTH AFFIRMATIVE DEFENSE

The Owners' own acts, omissions, and conduct, or the acts, omissions, and conduct of those for whom the Owners are legally or contractually responsible are the sole source of the alleged damage or injury to the Owners.

US2008 4966429 1

## SIXTH AFFIRMATIVE DEFENSE

The Owners' claims are barred, or due to be released, as a result of the Owners' failure to mitigate their alleged damages.

## SEVENTH AFFIRMATIVE DEFENSE

The Owners' claims are barred, or due to be released, as a result of the Owners' prior material breaches of the contract.

## EIGHTH AFFIRMATIVE DEFENSE

The Owners' claims are barred, in whole or in part, by the Owners' failure to provide timely and proper contractual and legal notice of their alleged claims.

## NINTH AFFIRMATIVE DEFENSE

The Owners' claims are barred, in whole or in part, because they are not ripe. Thus, the Owners have no standing to assert all or some of their claims in this matter.

## TENTH AFFIRMATIVE DEFENSE

The Owners' claims are barred, in whole or in part, because the Owners' claims are subject to the express conditions precedent of the EPC Agreement's claims and disputes resolution process, including mediation.

## ELEVENTH AFFIRMATIVE DEFENSE

The Owners' claims are barred, in whole or in part, because of failures of conditions precedent including, but not limited to, the Owners' failure to mediate their alleged claims as required by the EPC Agreement.

## TWELFTH AFFIRMATIVE DEFENSE

The Contractor adopts and incorporates herein by reference each and every allegation of the Contractor's Counterclaim Against the Owners as set forth herein.

US2008 4966429 1

### THIRTEENTH AFFIRMATIVE DEFENSE

The Owners' claims are barred, in whole or in part, because of the doctrine of unjust enrichment.

### FOURTEENTH AFFIRMATIVE DEFENSE

Because discovery is necessary to the proper resolution of this action and it is not yet complete, and in order to anticipate unknown facts that may develop, the Contractor refers to all affirmative defenses set forth in the Federal Rules of Civil Procedure and reserves its right to assert any one of them if such discovery reveals that such affirmative defenses are applicable.

### <u>THE CONTRACTOR'S COUNTERCLAIM AGAINST THE OWNERS</u>

Counterclaim-Plaintiffs Stone & Webster, Inc. ("S&W") and Westinghouse Electric Company LLC ("WEC") (collectively, S&W and WEC are referred to as the "Contractor"), by and through their respective attorneys, Watt, Tieder, Hoffar & Fitzgerald, L.L.P., Hull Barrett, PC, and Peckar & Abramson, P.C., representing S&W, and Kilpatrick Townsend & Stockton, LLP, representing WEC, and file this their Counterclaim and allege as follows:

### <u>PARTIES</u>

1.      S&W is a Louisiana corporation with its principal place of business in Charlotte, North Carolina.

2.      WEC is a Delaware limited liability corporation with its principal place of business in Cranberry Township, Pennsylvania.  No Member of WEC is a citizen of the state of Georgia.

3.      Counterclaim-Defendant Georgia Power Company ("GPC") is a Georgia corporation with its principal place of business in Atlanta, Georgia.

17

4. Counterclaim-Defendant Oglethorpe Power Corporation ("Oglethorpe") is an electric membership corporation formed under the laws of the State of Georgia with its principal place of business in Tucker, Georgia.

5. Counterclaim-Defendant Municipal Electric Authority of Georgia ("MEAG") is a public body corporate and politic and an instrumentality of the State of Georgia with its principal place of business in Atlanta, Georgia.

6. Counterclaim-Defendant The City of Dalton ("Dalton") is an incorporated municipality in the State of Georgia. GPC, Oglethorpe, MEAG and Dalton are collectively referred to herein as the "Owners."

## JURISDICTION

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), in that the matter in controversy, exclusive of interest and costs, exceeds $75,000.00 and is between citizens of different states.

## VENUE

8. While venue is proper in this District in that the Owners availed themselves of the venue and jurisdiction of this Court by filing the instant action, the Contractor contends that proceeding with the resolution of claims set out in the Owners' Complaint and the Contractor's Counterclaim in this Court is contrary to the provisions of Section 34.3 of the EPC Agreement and the Parties' conduct. The Contractor reserves its right to challenge the propriety of venue in this Court based upon the appeal currently pending in the United States Court of Appeals for the District of Columbia Circuit.

US2008 4966429 1

## BACKGROUND FACTS
### The Project and EPC Agreement

9.      The disputes between the Parties arise out of the design and construction of two new nuclear electrical generating units known as Vogtle Units 3 and 4 (the "Units"), located at the Vogtle Electric Generating Plant in Waynesboro, Georgia, and owned by the Owners (the "Project").

10.     The Contractor and the Owners entered into an engineering, procurement and construction agreement (the "EPC Agreement"), with an Effective Date of April 8, 2008, pursuant to which the Contractor agreed to, *inter alia*, design, engineer, procure, construct and test the Units and related facilities, structures and improvements (collectively "Facility") at the Project.  The EPC Agreement is voluminous, includes proprietary information and trade secrets in certain of its provisions, and is in possession of the Parties.

11.     The EPC Agreement is primarily a fixed-price Contract, with some cost-reimbursable elements.  During the Contract negotiation process, the Parties utilized an "open book" process to estimate and review the projected cost of the Project.  The Parties referred to the result of this process as the "Price Book."

12.     In the EPC Agreement, S&W and WEC are referred to collectively as the Contractor.

### Applicable Regulatory Process and Corresponding Contractual Risk Allocation

13.     The Owners were required to obtain a Combined Operating License (COL) from the United States Nuclear Regulatory Commission ("NRC") pursuant to the procedures set forth at 10 CFR Part 52.  A COL allows the applicant to both construct and operate a nuclear power plant at a specific site.  The Project was the first nuclear plant to be licensed in the United States

US2008 4966429 1

since 1978 and the first nuclear plant to receive a COL through the 10 CFR Part 52 process. Because no nuclear plants have been licensed in the last 30 years and the procedures used by the NRC to review and approve certain design documents and COL applications were being implemented for the first time, the Parties recognized that the process was uncertain and unpredictable at the time of contracting. As discussed below, the Parties to the EPC Agreement allocated the risk of increased costs and delay associated with that process to the Owners.

14.     Pursuant to Article 4.1(h) of the EPC Agreement, entitled "Owners' Government Approvals," the Owners were obligated to obtain various specified Government Approvals, including the COL for the Project.

15.     Pursuant to Article 4.1 of the EPC Agreement, the Owners were to obtain all Owners' Government Approvals, including the COL, as "required pursuant to the Project Schedule." Accordingly, the Owners were required to obtain the COL for the Project on or before July 1, 2011, in order to allow the Contractor to achieve its plan for achieving Substantial Completion of the Project.

16.     Because the COL process was uncertain, the Contract allocated the risk of a delayed and late COL issuance to the Owners under the expansive Changes Clause in Sections 9.1(a), (b), (c), (d) and (e).

17.     Knowing that the NRC's procedures and processes to review and approve design documents and license applications were uncertain, the Parties further provided in the EPC Agreement that any adoption, change, or interpretation of any Law as the term "Law" is broadly defined in the EPC Agreement, or the imposition of any requirement for a new Government Approval, or the imposition of any condition or requirement by a Government Authority affecting the issuance, renewal or extension of a Government Approval not required as of the

Effective Date of the EPC Agreement constituted a Change in Law for which the Contractor is to be compensated.

18.    In addition, the occurrence of any Uncontrollable Circumstances, as that term is defined in the EPC Agreement, constitutes a compensable Change entitling the Contractor to compensation for increased costs and a time extension to the Project Schedule.

## Shield Buildings for Units 3 and 4

19.    Each of the Units is designed with a structure referred to as a Shield Building.  A Shield Building is a conical structure that is designed to envelop and protect each Unit's Containment Vessel, radioactive systems and components from external events during normal operations.  A Shield Building also provides for cooling of the Containment Vessel and shielding against radioactive airborne materials that may be dispersed within the Containment Vessel.

20.    As of the Effective Date of the EPC Agreement, the NRC had issued a proposed rule relating to aircraft impact considerations for new nuclear power plants ("AIA Rule").  The unpromulgated AIA Rule would establish criteria to require that nuclear reactor shield buildings be capable of sustaining an aircraft impact without breaching the shield building.

21.    As of the Effective Date of the EPC Agreement, neither the Contractor nor the Owners could forecast what the NRC would ultimately require in order to satisfy the proposed AIA Rule.  Based upon the proposed AIA Rule and structural analyses, the Contractor determined that the proposed AIA Rule would require that the Shield Building design be changed from a reinforced concrete ("RC") structure to a steel composite ("SC") structure.  An SC structure is one where two large plates of steel are filled with an intermediate layer of concrete resulting in a steel-concrete-steel "sandwich."

22. On December 17, 2007, prior to execution of the EPC Agreement, the Contractor submitted its Price Book to the Owners. The Shield Buildings were excluded from the Price Book because the AIA Rule had not yet been issued and there was no guidance on how the NRC would implement the Rule for the safety of the public. The Owners directed the Contractor to include in the Price Book the then-current scope of the Units' Shield Building as an SC structure.

23. The then-current status of design for the Shield Buildings were set forth in three Design Change Proposals ("DCPs") identified as DCP228-Rev0, DCP248-Rev2 and DCP269-Rev1, which constitute the Baseline Design for the Shield Buildings.

24. The Parties agreed, and the EPC Agreement provides, that Work required of the Contractor beyond the Baseline Design would entitle the Contractor to a Change to the Contract Price and Project Schedule of the EPC Agreement.

25. The Baseline Design for the Shield Buildings prepared by the Contractor was suitable in all respects, could withstand all required design loads, met all applicable design criteria and was otherwise technically sound. Further, the Baseline Design was based upon an SC design methodology that had been previously certified by the NRC in a Design Certification process, which involved extensive testing, reliance upon international building codes for SC structures and NRC-sponsored studies and industry experts.

26. The Contractor acted in accordance with the Performance Standards specified in the EPC Agreement, including Prudent Practices, as that term is defined in the EPC Agreement.

27. Despite the Contractor's reasonable and prudent design, and the utilization of a prior-certified SC design methodology, the NRC required the Contractor to make significant Changes to the Baseline Design for the Shield Buildings.

US2008 4966429 1

28.     The Contractor, with the participation and initial concurrence of the Owners, disagreed with the NRC's requests and requirements for design Changes in that the Baseline Design for the Shield Buildings were suitable in all respects.  Ultimately, the Owners requested that the Contractor concede to the NRC and implement the NRC-imposed Changes to the Baseline Design for the Shield Buildings.

29.     The NRC-imposed Changes to the Baseline Design for the Shield Buildings required that the Contractor incur substantial design and construction costs, delayed NRC certification of the Project design, and has delayed and will continue to delay completion of the Project.

30.     Article 9.1 of the EPC Agreement sets forth an expansive Changes provision, entitling the Contractor to a Change Order when there is (a) any addition to, deletion from, or modification of the Facility, as described in the EPC Agreement, or any change in the Work that is agreed to by the Parties or imposed (except to the extent that any change in Work is imposed as a result of acts or omissions of Contractor or a Subcontractor or Vendor, which acts or omissions are inconsistent with the Performance Standards) by (1) the NRC in the COL which affects the capital Facility that is not set forth in the DCD (including without limitation AP1000 Facility information consistent with the DCD) or Site-Specific Documentation, or (2) the Georgia PSC Certification Order; (b) a delay in the issuance of the COL; (c) any breach by Owners of their obligations under the EPC Agreement; (d) a Change in Law; or (e) an Uncontrollable Circumstance.

31.     The EPC Agreement includes definitions of "Change in Law" and "Law" that are extremely broad and encompass the Changes imposed by the NRC.

US2008 4966429 1

32.     The EPC Agreement also provides a definition of "Uncontrollable Circumstances" that includes governmental actions or omissions.

33.     Upon establishing a Change under the EPC Agreement, the Contractor is entitled to an adjustment of the Contract Price, the Project Schedule, the Payment Schedules, the Guaranteed Substantial Completion Dates, the Critical Milestones, and/or such other parts of the EPC Agreement as may be affected by such Change.

34.     The Shield Buildings were designed in accordance with Performance Standards, Prudent Practices and pursuant to an NRC previously-certified design methodology. Upon NRC certification, that design methodology had become Law within the meaning of the EPC Agreement. The NRC's Change to this previously-certified design methodology constitutes a compensable Change in Law.

35.     The NRC's adoption of the AIA Rule is also a Change in Law. The NRC's combined interpretation and implementation of the AIA Rule and related guides, methodologies and manuals concerning its interpretation and the NRC's re-examination of the certified SC design methodology resulted in changes to the Contractor's requirements for the testing, analyses, validations and substantiations of the Shield Buildings. These Changes are specifically compensable under the Changes clause of the EPC Agreement.

36.     The NRC-imposed Changes to the Shield Buildings required not only substantial effort and cost on the part of the Contractor, but also required the Contractor to change the Shield Buildings' design and construction. The increased costs and delays due to these design Changes were incurred solely to address the NRC's directives, requirements and interpretations, all issued subsequent to the Effective Date of EPC Agreement. Accordingly, the actions by the NRC - and the Owners' directives to comply with them - constitute Changes in Law under the EPC

24

Agreement.

37. In addition to constituting a "Change in Law," the NRC-imposed Changes to the Shield Buildings were directed by the NRC as part of the COL approval process. Thus, they are also compensable Changes under the EPC Agreement for that reason.

38. The NRC-imposed Changes are unforeseeable events that affect the cost of and schedule for the Contractor's performance, are beyond the reasonable control of the Contractor and could not have been prevented by the Contractor.

39. It was unforeseeable that the NRC would require Changes to a certified SC design methodology and require analyses and Changes well in excess of those required by the certified methodology.

40. Employing an SC design for the Shield Buildings, premised on a certified SC design methodology, was in accordance with the Performance Standards, Prudent Practices and was a practical and sound decision under the circumstances and was made with the Project's and the Owners' best interests in mind. Moreover, the Owners were insistent upon inclusion of the SC design in the EPC Agreement.

41. The Contractor is entitled to an adjustment to the Contract Price and Project Schedule as contemplated and authorized by the EPC Agreement as follows:

     A.    The NRC-imposed changes resulted in a significant "addition to, deletion from, or modification of the Facility as described in this Agreement," and thus constitute compensable Changes under Section 9.1(a);

     B.    The NRC-imposed changes resulted in a "change to the work that is agreed to by the Parties or imposed ... by (1) the NRC in the COL which affects the Facility that is not set forth in the DCD (including without limitation AP1000 Facility information consistent with the DCD) or Site-specific Documentation, ...," and thus constitute compensable Changes under 9.1(a);

C.    <u>Change in Law</u>: the SC Shield Buildings as captured in the three DCPs which form the Baseline Design were designed in accordance with a previously NRC certified SC design methodology. That methodology had become a Rule, and consequently Law. The NRC's mandated deviation from that methodology, Rule and Law constitute compensable Changes in Law under 9.1(d);

D.    <u>Change in Law</u>: pursuant to the Parties' EPC Agreement, the AIA Rule required Contractor to design SC Shield Buildings. Any challenges and changes to the SC design are sourced in the AIA Rule which was the genesis and driver of the SC Shield Buildings. The "Change in Law" definition of the EPC Agreement provides that any interpretation of any Law inconsistent or at variance with that Law as of the Effective Date, or the imposition after the Effective Date of any condition or requirement affecting a Government Approval, is a compensable Change under 9.1(d);

E.    The NRC-driven changes are events that "prevent [] or delay[]" Contractor from "performing its obligations under the [EPC] Agreement" and are "beyond the reasonable control of" Contractor and thus constitute Uncontrollable Circumstances for which a Change Order is to be issued under Articles 9 and 10; and

F.    The delay in issuance of the COL was a risk allocated to the Owners under the EPC Agreement and entitles the Contractor to a Change under 9.1(b) and (c).

42.    Despite the Contractor's entitlement to adjustments to the Contract Price and Project Schedule due to NRC-imposed Changes to the Shield Buildings' design, the Owners have failed and refused to acknowledge such entitlement, contrary to the provisions and requirements of the EPC Agreement.

43.    The NRC-imposed Changes to the design of the Shield Buildings have imposed and will continue to impose upon the Contractor incremental costs in excess of Six Hundred Million Dollars ($600,000,000), for which the Contractor is entitled to reimbursement.

### Structural Modules

44.    The Plant incorporates modular construction of certain sub-assemblies that are housed both within and without each Unit's Containment Vessel. These structural modules are

26

comprised in part of structural steel walls that are fabricated offsite and then assembled either onsite or offsite depending upon the size of the module.

45.     As of the Effective Date of the EPC Agreement, the design of the structural modules had been certified by the NRC in a Design Control Document ("DCD") referred to as DCD Rev. 15, and which pursuant to the terms of the EPC Agreement, had become Law.

46.     DCD Rev. 16, which forms the basis of the Scope of Work for the EPC Agreement and is the EPC Agreement Baseline Design, incorporated both the SC design and SC design methodology that had been previously certified by the NRC in DCD Rev. 15.

47.     Therefore, both DCD Rev. 15 and DCD Rev. 16 were Law pursuant to the EPC Agreement, as they relate to the design of the structural modules.

48.     There have been two Changes to the design of the Structural Modules that entitle the Contractor to an increase in the Contract Price and an extension of the Project Schedule:  a Change in the module faceplate wall material and a Change in the design connecting the structural modules to the concrete basemat.

49.     Subsequent to the Effective Date of the EPC Agreement, the Contractor and the Owners agreed to implement a Change to the modules' faceplate wall material in order to avoid a potential NRC Backfit.  Based on concerns advanced by the NRC relating to an impending change in the American Institute of Steel Construction ("AISC") Code, indications that the NRC might impose a Backfit (which would require costly and time consuming retrofits), and Prudent Practices to mitigate cost increases and delays, the Contractor and the Owners agreed that the modules' design should be changed to specify faceplate material of uniform yield strengths. This Change caused several resulting modifications to the structural modules' design, including a Change in the stud spacing on the modules' walls and Changes to the modules' rolled shapes and

27

welding wire. These modifications required substantial drawing and calculation revisions resulting in design delays and significant unanticipated fabrication costs due to increased complexity, all of which will cause construction delays to the Project and Project Schedule.

50. The faceplate material Change for the structural modules was agreed to by the Contractor and the Owners at an executive meeting conducted on November 2, 2010. After discussion of the NRC's concerns regarding the impending AISC code, the potential for an NRC Backfit, and the significant costs and delays that would be incurred by such a Backfit, the Parties agreed to change the structural modules' faceplate and material design. The resulting Changes to the number and density of studs, rolled shape material and welding wire material flowed directly from the agreed-to changes as the Contractor was required to maintain yield strength uniformity among all components of the structural modules. The Contractor is entitled to compensation for this agreed-to Change.

51. The faceplate material Change was caused by unforeseeable events that affected and continue to affect the Contractor's cost of performance, are beyond the reasonable control of the Contractor and could not have been prevented by the Contractor.

52. In addition, the NRC required the Contractor to make Changes to the connection design between the structural modules and the basemat. The NRC required the deletion of the structural modules lapped spliced basemat connection design (which was specified and previously certified in DCD Rev. 15) and required utilization of more costly threaded rod and mechanical connections which affected approximately 70% of the submodules within four substantial structural modules referred to as CA01, CA02, CA05, and CA20.

53. By directing Changes to the structural modules wall to basemat connections which had previously become law in DCD Rev. 15, the NRC-imposed Changes constitute a

Change in Law pursuant to the terms of the EPC Agreement.

54.     The NRC's Changes to the previously-certified SC design and SC design methodology and mandate that the Contractor delete lapped splice connections and utilize only mechanical connections are Changes in Law.  The Contractor is entitled to a Change Order pursuant to Article 9 of the EPC Agreement.

55.     The NRC-imposed Changes to the structural modules' design are unforeseeable events that affected and are affecting the Contractor's performance costs, are beyond the reasonable control of the Contractor and could not have been prevented by the Contractor.

56.     The NRC-imposed Changes to the wall to basemat connections are unforeseeable events that have affected and will continue to affect the Contractor's cost of performance, and are beyond the reasonable control of the Contractor and could not have been prevented by the Contractor.  The Contractor had no reason to expect that the NRC would require Changes to a previously certified design.  The NRC's refusal to accept the lapped spliced detail is an unforeseeable event beyond the Contractor's reasonable control.

57.     The NRC-mandated and the Owners' agreed-to Changes to the structural modules design required subsequent to the Effective Date of the EPC Agreement are compensable as:

A.      Change as set forth in Article 9.1(a) - Both the structural modules wall to basemat connection Change and the faceplate material Change were either agreed-to changes or NRC-imposed changes to the Work beyond the EPC Agreement baseline.  Therefore, the Contractor is entitled to a Change Order.

B.      Change in Law - The Contractor's structural modules SC design and SC design methodology were certified by the NRC for AP600 in 1999 and AP1000 in 2006 (DCD Rev. 15).  That SC design and SC design methodology remained unchanged in DCD Rev. 16, which constitutes the EPC Agreement baseline.  Therefore, the structural modules SC design and SC design methodology are Law.  The NRC's Change to the Contractor's previously certified lapped splice connection design and mandate that the Contractor utilize only mechanical connections is a

Change in Law.

C.    <u>Uncontrollable Circumstances</u> - The NRC's re-examination of the structural modules design - certified in DCD Rev. 15, unchanged in DCD Rev. 16 and incorporated as the EPC Agreement baseline - was unforeseeable and beyond the Contractor's control. Further, the Contractor and the Owners faced the substantial risks of an NRC Backfit if they did not implement a change in the faceplate steel strength, stud spacing and material required for rolled shapes and welding wire. The Contractor is entitled to a Change Order for these "governmental actions" which were unforeseeable, arose due to no fault of the Contractor and were beyond its control.

58.    Despite the Contractor's entitlement to adjustments to the Contract Price and Project Schedule due to NRC-imposed Changes to the structural modules' design, the Owners have failed and refused to acknowledge such entitlement, contrary to the provisions and requirements of the EPC Agreement.

59.    The NRC-imposed Changes to the design of the structural modules have imposed and will continue to impose upon the Contractor incremental costs in excess of Seventy-Four Million Dollars ($74,000,000), for which the Contractor is entitled to reimbursement.

**Limited Work Authorization and Combined Operating License Delays**

60.    Pursuant to 10 CFR § 50.10(d), the NRC is authorized to issue a Limited Work Authorization ("LWA") prior to the issuance of a COL. The LWA allows the applicant to proceed with construction work, including the driving of piles, subsurface preparation, backfill and installation of foundations.

61.    The EPC Agreement and Project Schedule are premised on the Owners' receipt of an LWA from the NRC that would release the Contractor to perform all preparatory work for the commencement of pouring safety-related concrete for the Facility prior to the receipt of the COL.

62.    Pursuant to the EPC Agreement Project Schedule, the LWA was to be issued on

or before November 1, 2009, and in all events was to permit commencement of the installation of reinforcing bar ("rebar") at the Unit 3 Nuclear Island ("NI") by March 30, 2011.

63.     The Project Schedule also provides for the issuance of the COL for the Project by the NRC on or before July 1, 2011, to support first nuclear concrete for the NI basemat of Unit 3. These dates were required to be met in order to allow the Contractor to achieve its plan for substantial completion of the Project.

64.     Section 4.1 of the EPC Agreement requires the Owners to obtain specified Government Approvals, including the LWA and COL "at those times as may be required pursuant to the Project Schedule."  Accordingly, an LWA encompassing NI rebar installation was required from the Owners on or before March 30, 2011, in order to support NI rebar installation commencing on that date as required by the Project Schedule.  Further, a July 1, 2011 COL issuance was required to support the start of placing NI basemat concrete on that same date as required by the Project Schedule.

65.     Prior to the Effective Date of the EPC Agreement, the Owners had previously submitted an LWA that included the NI basemat rebar.  After the Effective Date, the Owners withdrew the NI basemat rebar portion of the LWA from the NRC review process.

66.     The LWA for NI basemat rebar was never issued.  The COL was issued on February 10, 2012, more than seven (7) months beyond the date required by the EPC Agreement.

67.     As a result of the failure to obtain an LWA for NI basemat rebar and the untimely issuance of the COL, there has been a delay to the critical path of the Project Schedule of more than ten (10) months, calculated from March 30, 2011 through February 10, 2012.

68.     Pursuant to Article 9 of the EPC Agreement, there has been a Change in the Work as a result of the late issuance of the COL and failure to obtain the requisite LWA to facilitate the

performance of the preparatory work pursuant to the Project Schedule in the EPC Agreement. Each entitles the Contractor to a Change Order. Section 9.1(a) of the EPC Agreement specifically provides that a Change results from "<u>any change in the Work</u> … that is … imposed … by (i) the NRC in the COL which affects the Facility …." (EPC Agreement, §9.1(a) (emphasis added)).

69.     Under the EPC Agreement, "Work" is defined to mean not only the Contractor's Scope of Work, but also the other provisions of the EPC Agreement.

70.     A compensable Change occurs under the EPC Agreement if an Uncontrollable Circumstance arises.

71.     The failure to issue an LWA and the delay in the issuance of the COL by the NRC constitute Uncontrollable Circumstances.  The NRC is a Governmental Authority as defined in the EPC Agreement:  it is a department or agency of the federal government "that has jurisdiction over Owner, Contractor, the Facility or the activities that are the subject of [the] Agreement."  The COL is a "Government Approval" - it is an "authorization, consent, approval, clearance, license, ruling, permit, … [or] certification … relating to the design, engineering, procurement, construction, testing, financing, completion, ownership or operation of the Facility."

72.     Section 4.1 of the EPC Agreement provides that it is the Owners' obligation to perform all of the responsibilities set forth in Article 4 "and elsewhere in this [EPC] Agreement, including Exhibit A … at those times as may be required by this Agreement for the successful completion of the Work in accordance with the Project Schedule."   One of the Owners' responsibilities is that "Owners shall be responsible for obtaining, maintaining and paying for Owners' Governmental Approvals  (including the COL ….)."   The Owners' failure to either

obtain the COL or issue the required LWA, which would have allowed critical path activities to proceed, has resulted in a "delay or other adverse impact" to the Contractor and, thus, constitutes a Change under the EPC Agreement.

73. The Contractor is entitled to an adjustment to the Contract Price and Project Schedule as provided by the EPC Agreement:

> A. The Owners' failure to issue an LWA to authorize the commencement of NI basemat rebar installation to support the rebar start date of March 30, 2011, is a failure of "Owners … [to] obtain[] Owners' Government Approvals *** as may be required pursuant to the Project Schedule."

> B. The Owners failed to obtain the COL by the date provided in the Contract Changes Clause as well as the date required by the Project Schedule, both of which failures entitle the Contractor to a Change under Article 9.1(b) and (c) as the untimely issuance of the COL is a failure of "Owners … [to] obtain[] Owners' Government Approvals *** as may be required pursuant to the Project Schedule."

> C. Change in Law:  The NRC's rejection of a previously NRC certified SC design methodology and the NRC's interpretation and implementation of the AIA Rule by way of NRC-imposed changes to the SC Shield Buildings design constitute Changes in Law which drove issuance of the COL.  Thus, the delayed issuance of the COL is the result of a Change in Law.

> D. Uncontrollable Circumstances:  The delayed issuance of the COL is an event that "prevents or delays [Contractor] from performing its obligation under [the EPC] Agreement [and] affects the costs of performing the Work; and [] is unforeseeable and beyond the reasonable control of and not the result of the fault or negligence of the Contractor …."

> E. The late issuance of the COL is a "change in the Work … imposed … by [] the NRC in the COL …."

74. Despite the Contractor's entitlement to adjustments to the Contract Price and Project Schedule due to the late issuance of the COL and failure to obtain an LWA, the Owners have failed and refused to acknowledge such entitlement, contrary to the provisions and requirements of the EPC Agreement.

75. The late issuance of the COL and failure to issue an LWA have imposed and will

continue to impose upon the Contractor incremental costs in excess of Two Hundred and Forty-Four Million Dollars ($244,000,000), for which the Contractor is entitled to reimbursement.

## COUNT I
### (Breach of Contract - Shield Buildings)

76. The Contractor repeats and realleges the allegations set forth in Paragraphs 1 through 75 as if such allegations were set forth at length herein.

77. As a result of the Changes to the Shield Buildings, the Contractor has been required to perform, and will be required to perform, significant amounts of extra and additional Work, which have resulted in and will continue to cause the Contractor to incur additional costs and expenses that were not required or contemplated by the terms of the EPC Agreement, but are to be recovered by, and paid to the Contractor.

78. As a result of the Changes, delays and extra work resulting from the Changes to the Shield Buildings, the Contractor has been, and will be, delayed in the performance of its Work. Pursuant to Article 9 of the EPC Agreement, the Contractor is entitled to an adjustment to the Project Schedule, the Payment Schedules, the Guaranteed Substantial Completion Dates, the Critical Milestones and such other provisions of the EPC Agreement affected by the Changes.

79. Contrary to the Contractor's entitlement under the terms of the EPC Agreement, the Owners have failed and refused to compensate the Contractor for the entire amounts due for the Changes to the Shield Buildings, despite the Contractor having demanded payment therefore. The Owners have also failed to adjust the Project Schedule as required by the EPC Agreement.

80. The Owners' failures to compensate the Contractor for the costs and expenses it has incurred and to adjust the Project Schedule are breaches of the EPC Agreement.

81. As a result of such breaches, the Contractor has been and will continue to be

damaged, and the Owners are severally liable, for an amount to be proven at trial, but which is currently believed to be in excess of Six Hundred Million Dollars ($600,000,000), plus interest thereon, less payments made by the Owners.

82.     The Contractor has complied with all conditions precedent, contractual and otherwise, required for the commencement of this action, including the requirements of the Dispute Resolution provisions in Article 27 of the EPC Agreement.

## COUNT II
### (Breach of Contract - Structural Modules)

83.     The Contractor repeats and realleges the allegations set forth in Paragraphs 1 through 82 as if such allegations were set forth at length herein.

84.     As a result of the Changes to the Structural Modules, the Contractor has been required to perform, and will be required to perform, significant amounts of extra and additional Work, which have resulted in and will continue to cause the Contractor to incur additional costs and expenses that were not required or contemplated by the terms of the EPC Agreement, but are to be recovered by, and paid to the Contractor.

85.     As a result of the Changes, delays and extra work resulting from the Changes to the Structural Modules, the Contractor has been, and will be, delayed in the performance of its Work. Pursuant to Article 9 of the EPC Agreement, the Contractor is entitled to an adjustment to the Project Schedule, the Payment Schedules, the Guaranteed Substantial Completion Dates, the Critical Milestones and such other provisions of the EPC Agreement affected by the Changes.

86.     Contrary to the Contractor's entitlement under the terms of the EPC Agreement, the Owners have failed and refused to compensate the Contractor for the entire amounts due for the Changes to the Structural Modules despite the Contractor having demanded payment

therefore. The Owners have also failed to adjust the Project Schedule as required by the EPC Agreement.

87.     The Owners' failures to compensate the Contractor for the costs and expenses it has incurred and to adjust the Project Schedule are breaches of the EPC Agreement.

88.     As a result of such breaches, the Contractor has been and will continue to be damaged, and the Owners are severally liable, for an amount to be proven at trial, but which is currently believed to be in excess of Seventy-Four Million Dollars ($74,000,000), plus interest thereon, less payments made by the Owners.

89.     The Contractor has complied with all conditions precedent, contractual and otherwise, required for the commencement of this action, including the requirements of the Dispute Resolution provisions in Article 27 of the EPC Agreement.

<u>COUNT III</u>

**(Breach of Contract - LWA/COL Delays)**

90.     The Contractor repeats and realleges the allegations set forth in Paragraphs 1 through 89 as if such allegations were set forth at length herein.

91.     As a result of the LWA and COL delays, the Contractor has been required to perform, and will be required to perform, significant amounts of extra and additional Work, which have resulted in and will continue to cause the Contractor to incur additional costs and expenses that were not required or contemplated by the terms of the EPC Agreement, but are to be recovered by, and paid to the Contractor.

92.     As a result of the Changes, delays and extra work resulting from the LWA and COL delays, the Contractor has been, and will be, delayed in the performance of its Work. Pursuant to Article 9 of the EPC Agreement, the Contractor is entitled to an adjustment to the

36

Project Schedule, the Payment Schedules, the Guaranteed Substantial Completion Dates, the Critical Milestones and such other provisions of the EPC Agreement affected by the Changes.

93.     Contrary to the Contractor's entitlement under the terms of the EPC Agreement, the Owners have failed and refused to compensate the Contractor for the entire amounts due for the LWA and COL delays despite the Contractor having demanded payment therefore. The Owners have also failed to adjust the Project Schedule as required by the EPC Agreement.

94.     The Owners' failures to compensate the Contractor for the costs and expenses it has incurred and to adjust the Project Schedule are breaches of the EPC Agreement.

95.     As a result of such breaches, the Contractor has been and will continue to be damaged, and the Owners are severally liable, for an amount to be proven at trial, but which is currently believed to be in excess of Two Hundred Forty-Four Million Dollars ($244,000,000), plus interest thereon, less payments made by the Owners.

96.     The Contractor has complied with all conditions precedent, contractual and otherwise, required for the commencement of this action, including the requirements of the Dispute Resolution provisions in Article 27 of the EPC Agreement.

## COUNT IV

**(Georgia Prompt Payment Act)**
**(O.C.G.A. §§ 13-11-1 *et seq*)**

97.     The Contractor repeats and realleges the allegations set forth in Paragraphs 1 through 96 as if such allegations were set forth at length herein.

98.     The Parties herein are subject to the Georgia Prompt Payment Act, O.C.G.A. § 13-11-1, *et. seq* ("Act"), as the Contractor is a contractor within the meaning of the Act and the Owners are an owner within the meaning of the Act. O.C.G.A. § 13-11-2.

99.     The Project is "real property" within the meaning of the Act. O.C.G.A. § 13-11-

2.

100.     The Contractor has performed in accordance with the provisions of the EPC Agreement, has satisfied all conditions precedent to payment and is entitled to payment as provided in the Act.  O.C.G.A. § 13-11-3.

101.     The Owners' failure to make payment in accordance with the EPC Agreement is a violation of the Act and the Contractor is entitled to recovery as provided by the Act.

102.     The Owners' failure to make payment in accordance with the EPC Agreement and in contravention of the terms of the Act entitles the Contractor to recover reasonable attorneys' fees pursuant to O.C.G.A. § 13-11-9, which is in addition to, and does not modify, the remedies available to the Contractor pursuant to the terms of the EPC Agreement.

103.     The Contractor has complied with all conditions precedent, contractual and otherwise, required for the commencement of this action, including the requirements of the Dispute Resolution provisions in Article 27 of the EPC Agreement.

## RELIEF REQUESTED

WHEREFORE, Stone & Webster, Inc., and Westinghouse Electric Company LLC respectfully request that judgment be entered in their favor and severally against the Owners:

(a)     On Count I, in an amount to be proven at trial but which is currently believed to be in excess of Six Hundred Million Dollars ($600,000,000), less payments made by the Owners, together with interest thereon, costs and expenses incurred herein and such other and further relief as the Court deems just and proper;

(b)     On Count II, in an amount to be proven at trial but which is currently believed to be in excess of Seventy-Four Million Dollars ($74,000,000), less payments made by the Owners, together with interest thereon, costs and expenses incurred herein and such other and further

38

relief as the Court deems just and proper;

(c)     On Count III, in an amount to be proven at trial but which is currently believed to be in excess of Two Hundred Forty-Four Million Dollars ($244,000,000), less payments made by the Owners, together with interest thereon, the attorneys' fees, costs and expenses incurred herein and such other and further relief as the Court deems just and proper.

(d)     On Count IV, in an amount to be proven at trial, but which is currently believed to be in excess of Nine Hundred Million Dollars ($900,000,000) less payments made by the Owners, together with interest thereon, the attorneys' fees, costs and expenses incurred herein and such other and further relief as the Court deems just and proper.

Respectfully submitted this 1st day of October, 2013.

**KILPATRICK TOWNSEND &
STOCKTON LLP**

By:     /s/ R. Perry Sentell, III
    R. Perry Sentell, III, Esq.
    GA Bar No. 635805
    699 Broad Street, Suite 1400
    Augusta, GA  30901-1453
    Telephone:        706.823.4260
    Facsimile:        706.828.4458
    E-mail:  psentell@kilpatricktownsend.com

- and -

Brian G. Corgan, Esq.
(Admitted pro hac vice)
GA Bar No. 187700
1100 Peachtree Street, Suite 2800
Atlanta, GA  30309
Telephone:     404.815.6217
Facsimile:     404.815.6555
E-mail:     bcorgan@kilpatricktownsend.com

COUNSEL FOR WESTINGHOUSE
ELECTRIC COMPANY LLC

**HULL BARRETT, PC**

By:    /s/ Neal W. Dickert                  
     Neal W. Dickert, Esq.
     GA Bar No. 220850
     801 Broad Street, 7th Floor
     Augusta, GA  30901
     Telephone:     706.722.4481
     Facsimile:     706.722.9779
     E-mail:   ndickert@hullbarrett.com

**WATT, TIEDER, HOFFAR &
FITZGERALD, L.L.P.**

Shelly L. Ewald, Esq.
(Admitted *pro hac vice*)
8405 Greensboro Drive, Suite 100
McLean, VA  22102
Telephone:    703.749.1000
Facsimile:    703.893.8029
E-mail:       sewald@wthf.com

**PECKAR& ABRAMSON, P.C.**

Michael A. Branca, Esq.
(Admitted *pro hac vice*)
D.C. Bar No. 447437
Two Lafayette Center
1133 21st Street, NW, Suite 500
Washington, D.C.  20036
Telephone:    202.293.7994
Facsimile:    202.293.7994
E-mail:       mbranca@pecklaw.com

COUNSEL FOR
STONE & WEBSTER, INC.

US2008 4966429 1

# CERTIFICATE OF SERVICE

In accordance with the Fed. R. Civ. P. and S.D. Ga. LR 5.1, I hereby certify that I electronically filed the foregoing **DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM TO PLAINTIFFS' COMPLAINT (DOC. 1)** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record:

> Thomas W. Tucker, Esq.
> Benjamin Brewton, Esq.
> **TUCKER, EVERITT, LONG BREWTON & LANIER**
> Post Office Box 2426
> Augusta, GA  30903-2426
> *Lead Counsel for Plaintiffs Georgia Power Company; Oglethorpe Power Corporation; Municipal Electric Authority of Georgia; and The City of Dalton, Georgia*
>
> G. Lee Garrett, Jr., Esq.
> Joseph E. Finley, Esq.
> **JONES DAY**
> 1420 Peachtree Street, N.E., Suite 800
> Atlanta, GA  30309-3053
> *Counsel for Plaintiffs Georgia Power Company; Oglethorpe Power Corporation; Municipal Electric Authority of Georgia; and The City of Dalton, Georgia*
>
> Frank E. Riggs, Esq.
> **TROUTMAN SANDERS**
> 600 Peachtree Street, N.E., Suite 5200
> Atlanta, GA  30308-2216
> *Counsel for Plaintiffs Georgia Power Company; Oglethorpe Power Corporation; Municipal Electric Authority of Georgia; and The City of Dalton, Georgia*
>
> Peter M. Degnan, Esq.
> Michael H. Shanlever, Esq.
> **ALSTON & BIRD**
> One Atlantic Center
> 1201 West Peachtree Street, Suite 4200
> Atlanta, GA  30309-3424
> *Counsel for Plaintiff Municipal Electric Authority of Georgia*

41

Charles W. Whitney, Esq.
2100 East Exchange Place
Tucker, GA 30084
*Counsel for Plaintiff Oglethorpe Power Corporation*

This 1st day of October, 2013.

BY:  **KILPATRICK TOWNSEND &
STOCKTON LLP**

By:  /s/ R. Perry Sentell
R. Perry Sentell, Esq.
GA Bar No. 635805
699 Broad Street, Suite 1400
Augusta, GA,  30901-1453
Telephone:  706.823.4260
Facsimile:  706.828.4258
E-mail:  psentell@kilpatricktownsend.com

42